[Civ. No. 34112.  Second Dist., Div. Two.  Dec. 4, 1969.]

WILLIAM D. LEWIS et al., Plaintiffs and Respondents, v.
AGRICULTURAL INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

Jones & Daniels and Robert E. Jones for Defendant and Appellant.

Staitman & Snyder for Plaintiffs and Respondents.

## Opinion

**HERNDON, J.**—Defendant Agricultural Insurance Company appeals from a judgment holding it liable to respondents to the full extent of its undertaking as surety on the bond of a notary public named Anna L. Green. The trial court found that as the proximate result of the misconduct and neglect of Green, acting in her official capacity as a notary public, respondents had suffered damage in an amount exceeding the penal sum of the bond.

Respondents were the owners of all the outstanding shares of stock in Wesmont Manufacturers Corporation, a California corporation. During the month of July 1965, respondents engaged in negotiations with Samuel. Goldblatt contemplating the sale of all their stock in said company to. Goldblatt and his wife, Hope Goldblatt, for the sum of $30,000.

An attorney named Robert L. McCoy represented Goldblatt in these negotiations and played an active part in the ensuing transactions. He also acted in the capacity of escrow agent in the consummation of the sale. Anna L. Green, the notary public whose conduct was the central subject of inquiry in the trial of this case, was McCoy's secretary.

In the course of the negotiations respondents investigated the financial status of Goldblatt and concluded that his resources and his credit rating were not such as to warrant acceptance of his unsecured obligation to pay the $30,000 and to perform other obligations to be imposed upon the purchasers under the terms of a hold harmless agreement. Having been so advised, Goldblatt and McCoy later represented to respondents that one David S. Kahan was ready and willing to join the Goldblatts as a purchaser and would sign the promissory notes and the hold harmless agreement which the sellers required.

Their investigations of Mr. Kahan satisfied respondents that he was possessed of such substantial financial resources that his joinder as a maker of the promissory notes and as a signatory to the hold harmless agreement would sufficiently insure the performance by the purchasers of the obligations evidenced by these instruments. However, respondent Lewis had discussed the subject with an attorney who knew attorney Robert L. McCoy and on the basis of that knowledge advised Lewis that he and his associates should "be sure to get the signatures notarized."

Lewis, acting for himself and other sellers, thereafter delivered to McCoy, as escrow agent, the two unsigned promissory notes and the hold harmless agreement with blank spaces indicated for the signatures of Hope Goldblatt, Samuel Goldblatt and David Kahan. The names of the three

purchasers were typewritten below the signature lines on this latter instrument.

Attached to each of the two promissory notes was a form of acknowledgment, the language of which will be indicated hereinafter. At the foot of the hold harmless agreement, and adjacent to the signature lines, there appears a form of a notarial jurat hereinafter quoted.

Mr. Lewis further testified that he delivered to Mr. McCoy stock certificates evidencing sellers' ownership of all of the shares together with stock powers with instructions that they were to be delivered to the purchasers in exchange for the promissory notes and the hold harmless agreement to be executed and notarized in the manner indicated. Lewis testified that the promissory notes and the hold harmless agreement were thereafter delivered to him in McCoy's office and that "McCoy and Green were there at the time I picked them up. Both of them were there."

When delivered each of the promissory notes bore signatures purporting to be those of Samuel Goldblatt, Hope Goldblatt and David Kahan.

Attached to each of the promissory notes was an acknowledgment in conventional form attesting that "On July 14, 1965, before me, the undersigned, a Notary Public in and for said State, personally appeared Samuel Goldblatt, Hope Goldblatt and David Kahan, known to me to be the persons whose names are subscribed to the within instrument and acknowledged to me that they subscribed the names principal. Witness my hand and official seal. Anna L. Green, Notary Public in and for said State." Each of these acknowledgments bears a handwritten signature purporting to be that of Anna L. Green and the imprint of the official notarial seal of Anna L. Green.

The notarial jurat adjacent to the signatures on the hold harmless agreement contains the language, "Subscribed and sworn to before me this 21st day of July, 1965." This jurat bears the genuine signature of Anna L. Green and the imprint of her official seal as a notary public.

Neither of the promissory notes was paid when due and no part of the consideration for which the notes had been given was returned to respondents. Respondents made demand for payment upon each of the makers of the promissory notes and demanded indemnification under the terms of the hold harmless agreement for payments of substantial sums of money which they had been required to pay on obligations of the Wesmont company.

When respondents demanded payment upon the instruments from Mr. Kahan, he denied that he had signed or had any knowledge thereof and disclaimed any obligation thereunder. It is undisputed that Mr. Kahan's signatures on both notes and on the hold harmless agreement were forgeries

and that he never appeared before Green to subscribe or acknowledge subscription to any of said instruments.

After respondents' demands for payment had been rejected, they instituted an action against the Goldblatts seeking recovery on the promissory notes and the hold harmless agreement. The Goldblatts were served with summons and complaint but they failed to answer and their defaults were entered. In the meantime the Goldblatts were adjudicated bankrupts.

It is expressly conceded by appellant that Samuel and Hope Goldblatt were financially incapable of responding to their obligations under the promissory notes and the hold harmless agreement. It is further conceded that if Mr. Kahan had been a signatory to the promissory notes and the hold harmless agreement he would have been financially able to respond to a demand by respondents for payment of the notes and of the obligations imposed by the hold harmless agreement. The evidence is uncontradicted that respondents relied upon the notarial acts of Green in entering into the transaction in which the promissory notes and hold harmless agreement were delivered to them in exchange for the shares of stock in Wesmont company.

A handwriting expert called by appellant as a witness at the trial testified that he had made comparisons of the purported signatures of Green appearing on the notarial acknowledgments on the promissory notes and on the notarial jurat appearing on the hold harmless agreement with signatures of Green known to be genuine. The witness opined that the purported signatures of Green on the two notarial acknowledgments were not in her handwriting. He testified, however, that the signature of Green on the jurat of the hold harmless agreement *was* in her own handwriting. Both parties appear to accept the opinions of the handwriting expert as being correct.

The trial court found that although the signatures of Anna L. Green on the promissory note acknowledgments were not in her own handwriting, nevertheless the certifications recited in the acknowledgments bearing her official seal were the certifications of Anna L. Green. This finding was predicated upon the inference or presumption that her signature had not been forged but had been placed on the instruments with her knowledge and consent.

The court further found that the conduct of Anna L. Green as evidenced by the misuse of her official seal and by the falsity of her certifications on the three instruments "constitute official misconduct and neglect within the meaning of Government Code Sections 8212-8214" and that such misconduct and neglect were the proximate cause of damage to respondents in excess of appellant's undertaking. On the basis of these findings judgment was entered in favor of respondents.

Appellant has advanced the following contentions: (a) That it is not liable on either of the promissory notes because the signatures thereon purporting to be those of notary Green are not genuine; (b) that it is not liable on the hold harmless agreement bearing Green's authentic jurat because it is not part of the notary's official duty to verify the identity of the signatory and the jurat does not in fact certify the identity of the person appearing to be sworn; (c) that the trial court erred in failing to make specific findings of the amount of the loss sustained by respondents on the hold harmless agreement; and (d) that the trial court abused its discretion in denying appellant's motion for a new trial on the ground of newly discovered evidence.

It is our conclusion and holding that the evidence in this case supports the findings of the trial court in every material respect and that the facts so found establish appellant's liability on its bond. Respondents have placed considerable emphasis and reliance upon the presumptions created by section 1452 of the Evidence Code that "A seal is presumed to be genuine and its use authorized if it purports to be the seal of: . . . (f) a notary public within any state of the United States," and by section 1453 that "A signature is presumed to be genuine and authorized if it purports to be the signature, affixed in his official capacity, of: (c) a notary within any state of the United States."

It is our view that it is unnecessary in this case to invoke or rely upon these presumptions in order to find abundant evidentiary support for the essential findings of fact upon which the judgment in this case is based. The facts proved and the inferences reasonably drawn therefrom lead to the almost unavoidable conclusion that Anna L. Green was a knowing participant in the false and fraudulent use of her signature and notarial seal.

It is beyond any reasonable question that Goldblatt and McCoy cooperated in the perpetration of the fraud. Green was McCoy's legal secretary. The proof that she signed and placed her notarial seal on the jurat of the hold harmless agreement, notwithstanding the undisputed fact that Kahan never appeared before her and never signed it, is enough in itself to support a finding of malfeasance and a fortiori a finding of neglect. According to the testimony of Mr. Lewis, she was present when this document and the other instruments bearing her notarial seal and her purported signatures were delievered by McCoy, her employer, in his office.

The record indicates that both Green and McCoy disappeared after the consummation of this fraudulent transaction and that efforts to locate them made by counsel on both sides proved unavailing. Similar efforts by other

authorities proved equally unsuccessful. The inferences of guilty knowledge reasonably to be drawn from the combination of undisputed facts appearing in this case are too obvious to require extended discussion.

Section 8214 of the Government Code provides: "For the official misconduct or neglect of a notary public, he and the sureties on his official bond are liable to the persons injured thereby for all the damages sustained."

"It has been repeatedy held in California that when a notary public assumes his office he is *required to perform his duties with honesty, integrity, diligence and skill.* His bond is executed for the purpose of protecting those who may suffer by his dishonesty and the bondsman is liable for damages resulting from the fraudulent acts of the notary committed in the performance of his duties." (Italics added.) (*Hungate* v. *Wells,* 129 Cal.App. 133, 135 [18 P.2d 64]; *Bank of America* v. *Dowdy,* 186 Cal.App.2d 690, 694 [9 Cal.Rptr. 779].)

The following quotations from the text of John's American Notaries, 6th Edition, are apposite: "Certifying to a person being present, when he or she is absent, is negligence, rendering the notary liable on his bond as for a false certificate. Such conduct is also to be condemned and treated as serious professional misconduct." (Pp. 173-174)

". . . . . . . . . . . . . . . ."

"The certificate of acknowledgment of a notary or consul is variously said to be conclusive or prima facie evidence of their official character and of the matters recited therein. In taking acknowledgments, an officer acts under the sanction of his official oath, and his certificate, required by law to be made, should be regarded as high a grade of evidence as if given under oath." (Pp. 183-184)

There is no merit in appellant's final contention that the trail court abused its discretion in denying appellant's motion for new trial. Appellant's motion was made solely on the ground of newly discovered evidence on affidavits by appellant's counsel and Anna L. Green, also known as Mrs. Robert L. McCoy or Anna L. McCoy. Appellant's counsel declares in substance merely that appellant, after the conclusion of the trial, employed the services of a detective agency which succeeded in discovering the whereabouts of Anna L. Green.

The affidavit of Anna L. Green, indicating that she is also known as Mrs. Robert L. McCoy, is the first indication we find in the record that she was the wife as well as the secretary of attorney McCoy, the escrow agent. In it she denies that she either signed or authorized the use of her signature upon

the acknowledgments and stated that she had never met David Kahan and that he had never signed any documents in her presence.

This affidavit is remarkable for the questions it raises and leaves unanswered. Least important of these questions, perhaps, relates to the time when she became the wife of the man charitably characterized by appellant's counsel as "the most suspect in the group."

In this affidavit Green avers that during the month of July 1965, her notary seal and record book disappeared from her employer's desk and that the seal was found several weeks later. Although she does not expressly so state, this averment is most reasonably construed to mean that her notarial seal and record book had disappeared from her employer's desk prior to July 14, 1965, the date of the acknowledgments on the notes, and that the seal was not found until several weeks later.

However, the testimony of appellant's handwriting expert, which both sides have accepted as correct, indicates that she herself affixed her signature to the jurat on the hold harmless agreement. This jurat certifies that the instrument was "subscribed and sworn to before me this 21st day of July 1965." Presumably she affixed her notarial seal to the jurat at the same time she dated it and affixed her signature thereto—that is, at least seven days *after* the seal allegedly had "disappeared."

The contradictions in Green's affidavit are emphasized by the equivocal manner in which she questions the genuineness of her signature on the jurat. If this affidavit had been available at the time of the trial and if counsel had stipulated that it might be received in evidence, it would have provided additional support to the trial court's findings with respect to her official misconduct.

■ The granting or denial of a motion for a new trial upon the ground of newly discovered evidence is generally a matter within the discretion of the trial court and the order will be affirmed unless there is a showing of a clear abuse of discretion. (*Slemons* v. *Paterson,* 14 Cal.2d 612, 615 [96 P.2d 125]; *South Santa Clara etc. Dist.* v. *Johnson,* 231 Cal.App.2d 388, 407 [41 Cal.Rptr. 846]; *Haussler* v. *Wilson,* 164 Cal.App.2d 421 [330 P.2d 670].) The newly discovered evidence in this instance consisted of the testimony of Anna L. Green, also known as Anna L. McCoy, who was located by a detective agency after the trial.

■ A new trial may only be granted upon the ground of newly discovered evidence where there is a showing that such evidence could not in the exercise of due diligence by the moving party have been discovered before the trial. (*Putnam* v. *Pickwick Stages,* 98 Cal.App. 268, 275 [276

P. 1055] ■ The declaration of appellant's counsel clearly discloses that the detective agency was not employed to locate Green until after the trial. It cannot be said that the trial court abused its discretion in denying the motion for new trial when it appears that the absent witness could as easily have been located before trial had the services of the detective agency been timely employed. Appellant's counsel should have moved for a continuance to secure the appearance and testimony of the codefendant. (*Putnam* v. *Pickwick Stages, supra,* at p. 275.) ■ "The claim of newly discovered evidence as a ground for new trial is uniformly looked on by the courts with distrust and disfavor because the policy of the law requires a litigant to exhaust every reasonable effort to produce at his trial all existing evidence on his behalf. (Citations.)" (*South Santa Clara etc. Dist.* v. *Johnson, supra,* 231 Cal.App.2d 388, 407.) ■ Moreover, "the general rule is that the absence of a witness does not warrant the granting of a new trial on the ground of surprise, since the parties are bound to use reasonable diligence in endeavoring to procure the attendance of witnesses, and, in case of their nonappearance, to move for a continuance." (*Baker* v. *Berreman,* 61 Cal.App.2d 235, 237-238 [142 P.2d 448].) This is a fortiori true where the missing witness is a codefendant and principal on appellant's surety bond.

The judgment is affirmed.

Roth, P. J., and Wright, J., concurred.